TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Plaintiff,

v.

COAXIAL COMMUNICATIONS OF CENTRAL OHIO, INC., Defendant.

No. 88 Civ. 1073 (VLB).

United States District Court, S.D. New York.

Dec. 8, 1992.

Sheldon Oliensis, Aaron Stiefel, Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiff.

David N. Ellenhorn, Roanne L. Mann, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case involves alleged breach by defendant ("Coaxial") of a commitment letter binding it to borrow and plaintiff ("TIAA") to lend $55 million to three related entities for ten years at 11.44% interest. As described below, both parties sought changes in several of the key provisions of the commitment letter. The key question in this litigation was which party (if not both) was responsible for the ultimate breakdown of negotiations to translate the commitment letter, which I held to be binding on both parties, into an actual loan agreement.

After a jury trial, a verdict was rendered for defendant. TIAA has moved for a new trial pursuant to Rule 59, Fed.R.Civ.P., or in the alternative for judgment as a matter of law on the issue of liability under Rule 50, Fed.R.Civ.P.

I find that the jury could reasonably have concluded from the evidence, and under my instructions as quoted below, that TIAA had effectively terminated the negotiations to implement the commitment letter prior to the time that Coaxial formally did so, and hence that Coaxial did not breach its commitment. Accordingly, I deny both motions.

TIAA is one of the largest institutional investors in the United States, with a portfolio of approximately $27 billion (Tr. 541). It invests in both publicly traded and privately placed corporate bonds (see generally Tr. 539–43) including some which pay a high rate of interest. It frequently seeks what is termed "call protection" provisions for the purpose of providing TIAA greater stability in its investment income (Tr. 548). These provisions are designed to prevent borrowers from prepaying, or to make it expensive for borrowers to prepay, their obligations to TIAA.[1] This is the latest in a series of cases in recent years brought in this court concerning such provisions. See *Teachers Ins. & Annuity Ass'n v. Walter Kidde & Company, Inc.*, No. 76–5128 (S.D.N.Y. July 28, 1978); *Teachers Ins. & Annuity Ass'n v. Butler*, 626 F.Supp. 1229 (S.D.N.Y.1986); *Teachers Ins. & Annuity Ass'n v. Tribune*, 670 F.Supp. 491 (S.D.N.Y.1987); *Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal*, 791 F.Supp. 401 (S.D.N.Y.1991).

### II

In the fall of 1987, TIAA's private placement division was less successful than its public bond division in placing investments[2] and committed to lend $55 million for ten years at 11.44% interest to three

---

1. Call protection provisions are enforceable contracts, particularly where, as here, they are bargained for in return for the lender's parallel commitment to make the loan on the agreed terms (identity of borrowers, rate of interest and term of loan). The enforceability of the provisions is not affected by the reality that the income stream stability sought by call protection clauses is, of course, contingent on continued solvency of the borrower and absence of a Chapter 11 filing or other untoward event af-

fecting repayment, the risk of which is greater if the borrower no longer finds the arrangement profitable and seeks a way out.

2. Coaxial contended, and the jury could reasonably have found, that the private placement division was under pressure to produce more completed commitment letters in late 1987. See Tr. 302–04, 542–47, 1208–09, 1571–72, PX 273–75.

borrowers: Coaxial, a cable television operator based in Ohio, and two nonoperating partnerships. Coaxial asked that the loan include the partnerships, which had negative net worths, for tax reasons.[3]

Implementation of the transaction required negotiation of a final loan agreement containing detailed and complex terms (Tr. 998–99, 1002–05). Outside counsel for TIAA (Milbank, Tweed et al.), found difficulty with this structure, although all of the three borrowers—one of which was Coaxial—would be jointly liable for the full amount of the loan (Tr. 433–37, 951, 064–651079–81, 1104–05). At first, neither Milbank nor TIAA informed Coaxial as to the nature of their difficulty, but eventually articulated it as a technical fraudulent conveyance issue (see Tr. 292, 374–75, 943–784, 1079–84, 1101–1108). The negotiations continued for periods significantly longer than originally expected (Tr. 216–20, 937–40, 1098–1106). Ultimately, Milbank prepared a 64–page draft loan agreement, although numerous technical issues remained open. See Tr. 425, 444–46, 938, PX 186.

By this time, Coaxial began to explore other options and requested TIAA to permit it to withdraw from the transaction at any time upon payment of a prepayment premium to be agreed upon by the parties. Coaxial made this request directly to a high TIAA official, bypassing in the first instance the TIAA transaction manager directly involved. The manager expressed anger upon discovering that Coaxial negotiators had gone over his head. See Tr. 298, 401–408.

The TIAA manager thereafter told Coaxial that its request would be granted but on terms Coaxial would not like (Tr. 195, 408). These terms involved a 15% prepayment premium based on the $55 million amount contained in the commitment letter, thus amounting to approximately $8 million; this premium was to have been calculated based on the assumption that bare Treasury bill rates (rather than universally higher corporate bond yields) represented the value of money to TIAA after any prepayment.[4] See Tr. 195–96, 298–99, 404–05; see also Tr. 243–44.

At the same time TIAA, without consulting or informing Coaxial, told Milbank to cease technical work on the transaction (Tr. 410–11, 486–88, 637–38, 1000–01, 1085), assertedly to save Coaxial (which was to pay TIAA's out of pocket expenses) money (Tr. 411). Coaxial learned of this stoppage for the first time when Milbank refused to accept Coaxial's comments on the latest draft of the final loan agreement.[5] See 487–88, 1000–01, 1085. Coaxial thereafter informed TIAA that it would no longer proceed (Tr. 1117–18) with the transaction and TIAA brought this lawsuit.

TIAA's argument at trial was that Coaxial had terminated the transaction because interest rates were lower in January 1988 than in October 1987, since when stock prices fell dramatically on and after October 19, 1987 ("Black Monday"), the Federal Reserve System enhanced the currency supply.

**3.** See Tr. 1674–68, 435–036, 1096–1100, CD.

There was no indication in the record that any nontax objectives of the inclusion of the partnerships as borrowers were suggested during the negotiations (Tr. 159, 962–63, 1078, DX AE). See generally *United States v. Ingredient Technology Corp.*, 698 F.2d 88 (2d Cir.), *cert. denied* 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); see also *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

**4.** Under the commitment letter, Coaxial would have been able to prepay the loan only after five years. The prepayment premium would have been based on the yield of Treasury securities plus 91 "basis points," or .91% additional interest. The higher the imputed value of money to the lender, the more the lender is estimated to recover from use of the money after prepay-

ment, and hence the lower the prepayment premium.

By contrast, a lower imputed interest rate leads to a greater assumed loss to the lender from not retaining its income from the transaction. This requires a higher prepayment premium to make the lender whole.

Treasury securities, backed by the credit of the United States, carry lower yields than commercial paper such as that involved in this case. For this reason, TIAA's prepayment offer was, as its manager told Coaxial's representative, one Coaxial "would not like."

**5.** At trial, the TIAA middle manager involved testified Milbank was told to stop work in order to save Coaxial money since Coaxial was required to pay TIAA's reasonable out-of-pocket expenses.

During the months immediately following Black Monday, Treasury and other quality securities did indeed command lower interest rates. Riskier securities, however, made less desirable by a "flight to quality," became harder to place, requiring the offerors to pay a higher interest rate to find lenders. Much of the evidence at trial centered around TIAA's efforts to show that Coaxial's obligations were relatively high quality securities, and on the part of Coaxial to show that they were relatively risky.

According to the evidence submitted by the parties, the Coaxial offering to TIAA, at 11.44%, would have fallen almost precisely on the boundary between issues which rose and those which fell in value and effective yield as of the time of the breakdown of the negotiations.[6] This would indicate that there was little or no gain or loss to either party as a result of the cancellation of the transaction (other than out-of-pocket expense which Coaxial was required to pay and which the jury awarded to TIAA).

### III

Prior to trial, both parties moved for summary judgment. I found the commitment letter in this case to be a binding agreement, but denied TIAA's motion for summary judgment:

> I find that there is no substantial issue of fact with respect to the thrust of the agreement. The agreement of September 30th and the [superseding] agreement of October 26th [1987] were agreements to lend and to borrow a specific amount of money at a specific rate of interest. They were binding agreements.
>
> I am not prepared to proceed from that finding to conclude that the plaintiff is entitled to summary judgment with respect to liability. I note first that other cases involving the same fact pattern have been in practice fact driven. I am not prepared to say that having found

there was a binding agreement here there are not questions of fact with respect to breach, with respect to efforts to cure the breach, et cetera.

> Although there was a binding agreement here, a jury might find as a matter of fact that the activities of the defendant were justified or activities of the plaintiff constituted breaches which would warrant or might have warranted the defendant's ultimate failure to perform the contract.
>
> I am not suggesting that a jury would make those findings. To the contrary, it does seem to me on the facts as they were laid before me on this motion for summary judgment as to liability, I am inclined to think that a jury will ultimately find that there was an unjustified repudiation of the contract by the defendant. But that is for the future. Tr. Nov. 26, 1991 at 82-83.

Trial commenced on July 7, 1992. On July 23, 1992, the jury began deliberations at 11:32 a.m. and reached its verdict at 1:50 p.m. without any intervening requests other than for exhibits. The form for verdict furnished to the jury asked as question 1:

> Do you find that Coaxial breached its commitment letter with TIAA?

The jury answered this question "No."

After an intervening question as to damages in the event the jury's response to the first question had been Yes, a third question read as follows:

> If you answered question 1 "Yes," do you find that both parties were concurrently responsible for preventing the commitment letter from leading to an actual loan?
>
> ____ Yes
>
> ____ No
>
> If the answer is "Yes," what proportion of 100% of the responsibility do you allocate to Coaxial? _____%

---

**6.** The changes in average and median values from September 1987 to January 1988 of corporate bonds listed on PX 240 as carrying yields between 11% and 12% in September 1987, suggest that in both, the changes in yield between those dates were less than $\frac{1}{4}$ of 1%. Tr. 1500- 01; see Tr. 1450-56. The effect of company-specific events is diluted by the averaging process and almost eliminated when a median is used. No company-specific event affecting the value of the Coaxial's obligations was suggested by either party.

Having answered the first question "No," the jury did not reach the matter of damages, nor the third question.[7]

IV

■■■ Every contract, including one requiring negotiation of an implementing agreement, contains an implied covenant of good faith. *Cross & Cross Properties v. Everett Allied Co.*, 886 F.2d 497, 505 (2d Cir.1989). As explained in Official Comment #1 to N.Y.U.C.C. § 2–610, quoted in *Bausch & Lomb, Inc. v. Sonomed Technology*, 780 F.Supp. 943, 963 (E.D.N.Y. 1992), repudiation or anticipatory breach of a contract occurs when there has been an "overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance."

Section 2–610(c) describes the consequences of repudiation or anticipatory breach as follows: "When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... suspend his own performance ..."

And where a "contract is not clearly divisible ... the breaching party can not require the non-breaching party to continue to perform what is left of the contract." *Stone Forest Industries v. United States*, 973 F.2d 1548 (Fed.Cir.1992), citing Restatement of Contracts (Second) §§ 237, 240.

Restatement of Contracts (Second) § 237 (1981) likewise indicates that "it is a condition of each party's remaining duties to render performances to be exchanged ... that there be no uncured material failure by the other party to render any such performance due at an earlier time." Illustration 1 indicates that B's failure to make a monthly payment for a period of a week on a construction job will permit A, the contractor, to stop work until B offers to make the delayed payment. Illustration 2 involving a similar nonpayment for a full month indicates that if in all the circumstances it is too late for B to cure the material failure, A's duties are discharged.

As exemplified most clearly in Illustrations 1 and 2 to Restatement § 237, none of these authorities suggests that notice of an obvious breach, such as terminating all further work on technical aspects of a final agreement, is necessary where the party taking such a step is fully aware of what it is doing and makes no offer to cure or retract the action.

Restatement (Second) of Contracts §§ 241, 242 (1981) describes circumstances affecting the extent to which a breach is material, including whether the conduct comports with good faith, likelihood of cure given all of the circumstances including reasonable assurances (or, presumably, their absence), and hinderance of substitute arrangements.

■■■ Where situations involving preliminary work relating to preconditions to completion of a transaction have been involved, courts have recognized that negotiating or taking other steps which are preconditions to completion of a transaction in good faith are necessary to claiming a breach by the other party. See generally *Royce v. Rymkevitch*, 29 A.D.2d 1029, 289 N.Y.S.2d 598, 601 (3d Dep't 1968); *Evans, Inc. v. Tiffany & Co.*, 416 F.Supp. 224, 240 (N.D.Ill.1976).

V

■■■ My instructions regarding the entire case, including the first and only question the jury answered were based on these principles and included the following:

The basic issue presented in this case is whether or not Coaxial breached an agreement with Teachers to make a loan agreement, and if it did, what if any loss Teachers suffered by reason of that breach.

The basic document before you is ... Exhibit 19 ... a letter dated October 26th, 1987, from Teachers to Coaxial, and what this letter does is to provide that Teachers and Coaxial agree that on cer-

---

7. My rulings on issues to be presented to the jury were discussed both at the charging conference and in a memorandum order of July 21, 1992. 799 F.Supp. 16.

tain terms a loan agreement will be executed between Teachers and Coaxial....

\* \* \* \* \* \*

You will undoubtedly find that that letter was accepted and agreed to, and so, I instruct you as a matter of law that that letter constituted a binding agreement and it was a binding agreement, moreover, to negotiate a loan agreement on very specific terms. The amount to be loaned was $55 million dollars, the interest rate was to be 11.44 percent.... and the term was ten years.

Now, you have learned through the testimony that while this was a two-page letter ... the preparation of the loan agreement that this letter contemplates was a very difficult process. There were a great many documents that had to be drawn up and there was undoubtedly going to be a great deal of negotiation with respect to the drawing up of those documents.

But there was an obligation on the part of both of the parties to negotiate in good faith to consummate this loan agreement. A party to an agreement is required to perform the terms of that agreement. If a party breaches the terms of an agreement, the other party has certain options ...

A breach is a violation of a material term of an agreement ... and it is for the jury to determine materiality with respect to any alleged breach.

A party to an agreement which has been breached by the other party cannot, without more, withdraw from the agreement. The agreement will continue, for example, if the party that has not breached waives the breach and continues performance.

Before the party that has not breached may regard the obligations under the agreement as terminated, [it] must give the breaching party notice that there has been a breach and that ... it expects the breach to be cured.

All this is very simple. If we're talking about a fully executed agreement to do something very tangible, if for example a person who has a piece of land wants a house built on that land and.... makes a contract with a general contrac-tor to build that house, all of the terms of the building of the house will be set forth in the written agreement.

And let us assume that that written agreement calls for a red roof. The contractor puts on a green roof. That's a material change. Anyone who owns a house and chooses a red roof has a pretty good reason for doing it and it is a material change.

But let us further assume that the person who owns the house, who owns the land, does nothing. He sees the green roof where it should have been a red roof and ... lets the contractor finish the house and then says to the contractor, "You breached the contract. I wanted a red roof, you gave me a green roof, so I won't pay you."

He may not do that. By letting the contractor finish the job without telling him that he is going to require him to cure that breach ... the owner has waived the breach.

So ... with respect to most contracts, when a person breaches the contract, the other side must give the person notice that he will be required to cure that breach before the non-breaching party can take the position that there has been a definitive and terminal breach.

We are dealing in this case with something which is much less tangible than a contract to build a house. We are dealing with a contract to make a loan; the terms of which are very specifically spelled out, $55 million, ten years, 11.44 percent interest, and there are other provisions that are specifically spelled out.

But translating these provisions, the terms and conditions in this commitment letter, to a definitive loan agreement is a complicated matter.... There are going to be any number of matters between the commitment letter and the final loan agreement which are going to have to be negotiated.

Now, you may find in this case that the commitment letter was made by businessmen and that the preparation of the loan documents was turned over to lawyers. Lawyers have a faculty, either happy or unhappy, of seeing problems

where we ordinary mortals don't see them. That is part of their job.

\* \* \* \* \* \*

... Since TIAA is the plaintiff, it has the burden of establishing the essential elements of its claim by a preponderance of the credible evidence....

\* \* \* \* \* \*

... [T]here is and there was a continuing obligation on both sides to negotiate in good faith..... and you will also want to consider the interrelationship between different demands and requests that were made by either side. Tr. July 23, 1992 at 1606–1617.

TIAA made no objections to these portions of the charge, nor does it claim error in any of the quoted language in its motions. TIAA's contention that a reference to "obstructional" aspects of negotiations if found by the jury in connection with the third question put to the jury had the effect of limiting the consideration of good faith in the negotiations to the third question (relating to shared responsibility) and not the first question (the issue of breach), is lacking in merit.

SO ORDERED.