**Elmore V. SCHUELER, as Chairman of the Board of Teamsters Local 445 Construction Division Welfare Fund, Teamsters Local 445 Pension Fund and Teamsters Local 445 Construction Division Annuity Fund, Plaintiffs,**

v.

**ROMAN ASPHALT CORP., Defendant.**

No. 93 Civ. 0073 (VLB).

United States District Court,
S.D. New York.

July 26, 1993.

Donald L. Sapir, White Plains, NY, for plaintiffs.

Richard A. Sulzman, New York City, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case, although involving a relatively small amount (approximately $10,000) of unpaid fringe benefit contributions due from a small construction firm, raises important questions concerning means of collection of such delinquencies. It also presents the issues of how reasonable attorney's fees should be calculated in debt collection suits such as this one brought pursuant to federal law (in this instance under ERISA, 29 U.S.C. § 1132), and of when out-of-court oral settlement agreements between counsel are binding.

Defendant Roman Asphalt Corp. ("Roman") by its answer concedes liability for the unpaid contributions claimed but states that its delinquency resulted from inability to pay. Plaintiffs (the "Funds") seek summary judgment for the delinquent amounts, for agreed liquidated damages for delay, and for attorney's fees. Roman has cross-moved to enforce a purported oral settlement agreement between counsel.

Jurisdiction over this case is based on the general federal question provision (28 U.S.C. § 1331), § 301 of the Labor–Management Relations Act of 1947 ("Taft–Hartley Act"), applicable to suits to enforce collective bargaining agreements, and ERISA, 29 U.S.C. § 1132.

I grant the Funds' motion for summary judgment for the amounts due in connection with the delinquency as set forth in ¶ 6 ("¶ 6") of the affidavit in support of the Funds' application ("Fund affidavit"), and for reasonable attorney's fees as sought in the amount of $3,287.50. The Funds may serve and file a proposed judgment for these amounts.[1] Roman's cross-motion to enforce the asserted settlement is denied.

## II

This controversy must be evaluated against the background of the special status of fringe benefit contributions under 29 U.S.C. § 1132. It must also be considered in the context of the guidance given to the federal courts in debt collection suits by the Federal Debt Collection Procedures Act of 1990, 28 U.S.C. § 3001 *et seq.* Consideration must also be given to the proper treatment of situations in which the litigation activity generated may be unjustified by the amounts at stake.[2]

The importance of reliable payment of agreed employer payments to employee fringe benefit funds has increased steadily ever since such benefits were made a mandatory subject of collective bargaining. See *Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th

Cir.1948), *cert. denied* 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949).

The critical importance of regular payments by employers to long-term employee benefit programs [3] is underlined by the current reliance on third-party financed health care and other essential protections of the welfare of employees and their families.[4] The need for a dependable flow of funds and the nature of the employer-union relationship counsel against special concessions to any given employer, unless comparable extensions to work out debt obligations would be considered appropriate in other cases as well.

Trustees of employee benefit funds are required to administer them "solely in the interests of the plan's participants and beneficiaries in a prudent fashion," 41 Fed.Reg. No. 60 at 12740 (March 26, 1976). Such trustees are required to make "systematic, reasonable and diligent efforts to collect delinquent contributions ..." Id. at 12741. Further, if "failure to collect is the result of an arrangement, agreement or understanding, express or implied, between the plan and the delinquent employer, such failure to collect a delinquent employer contribution may be deemed to be a prohibited transaction." Id.; see *Diduck v. Kaszycki & Sons Contractors*, 974 F.2d 270, 277 (2d Cir.1992).

Against this backdrop courts should be reluctant to enforce controverted informal oral commitments to grant to particular employers pre-judgment extensions of time for payment of fringe benefit contributions. At the same time, collection is often most effective when workouts, rather than destruction

---

1. In light of the circumstances described below, the Funds cannot expect to prevail in a subsequent application for further attorney's fees based on costs of litigating the current applications; I have taken the amount of work which would appropriately be necessary into account in evaluating the fee properly due on the present application. See *Smiley v. Sincoff*, 958 F.2d 498, 502 (2d Cir.1992).

2. This phenomenon has been identified as a drag on the nation's industrial competitiveness. See F. Gibney, *Miracle By Design: The Real Reasons Behind Japan's Economic Success* (1982).

3. See *TIAA v. Coaxial Communications of Central Ohio*, 799 F.Supp. 16 (S.D.N.Y.1992), *later decision* 807 F.Supp. 1155 (S.D.N.Y.1992).

4. The need for the uninterrupted flow of monies to third-party medical and other payment programs is made more manifest by difficulties experienced in reining in the costs of such programs. Under these programs neither providers nor beneficiaries directly pay the costs and hence have no incentive to limit expense, leading to intricate and independently costly regulatory controls. See generally Rose–Ackerman, "Social Services and the Market," 83 Colum.L.Rev. 1405 (1983); "Improper Practices, Commodity Import Program, U.S. Foreign Aid," Hearings before Permanent Subcomm. on Investigations, Senate Committee on Gov't Operations, 90th Cong., 1st & 2d Sess. (1967–68).

of a enterprise in financial difficulty, can be arranged. The very urgency of an objective within the legal system tends, unless care is taken, to lead to excessively rigid implementation of the goal with counterproductive results.[5]

Employer contributions to fringe benefit funds have been regulated by federal law since the enactment of 29 U.S.C. § 186, as § 302 of the Labor Management Relations Act of 1947 ("Taft–Hartley Act"), Public Law 101—80th Congress. Section 302, in providing for joint employer and union control of such funds, was designed to prevent unilateral union control which might lend itself to employer payments for union use that could influence union officials to favor a particular employer's interests.

Such cozy relationships would be contrary to the duty owed by labor organizations fairly to represent all employees in the bargaining unit in exchange for exclusive bargaining authority provided by the original Wagner Act of 1936, carried over under the Taft–Hartley Act as 29 U.S.C. § 159. See *Chauffeurs, Teamsters & Helpers Local No 391 v. Terry*, 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990); *Steele v. Louisville & Nashville R. Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); see also *Taormina v. International Union*, 798 F.Supp. 193 (S.D.N.Y.1992). The joint welfare fund provision is one of the exceptions to an otherwise sweeping ban on employer contributions to unions or union officials, imposed as a means of avoiding favoritism to generous employers.

Special treatment of favored employers tends to encourage or reflect the existence of "sweetheart" arrangements detrimental to employees of the favored employers, and also hurting competitors of such employers. See Federal Bar Council, Committee on Labor Law, "Sweetheart Contracts," 115 Cong. Rec.S. 6318 (daily ed. June 12, 1969), 23 Industrial & Labor Rel. Rev. No 1 at 105 (Oct. 1969). Arrangements of this type, when allowed to fester, have in the long history of the American labor movement fre-

quently led to violence. See P. Zausner, *Unvarnished* (1941).

The need to deter "sweetheart contracts" in labor relations extends to small as well as large employers, inasmuch as once tolerated, the practice has a tendency to spread; this need has supported expansive application of the federal commerce power over industries affecting commerce to punish even bribes designed to facilitate dismissal of a single janitor in an apartment building. See *United States v. Ricciardi*, 357 F.2d 91 (2d Cir.), cert. denied 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 840 (1966).

Where a large number of small as well as larger employers forms a significant part of an industry, multi-employer (often industry-wide or local union-wide) fringe benefit plans are common. The existence of such plans reflects the instability of employers and the high mobility of work. In the case of the construction industry, these realities are reflected in legislative authorization granted by 29 U.S.C. § 158(f) for otherwise prohibited prehire collective bargaining contracts.

Uniform multi-employer contribution standards are recognized as vital to employees, their unions, and competing employers in industries of this type. See Brooks, *The Sources of Vitality in the American Labor Movement* 22 (Cornell University 1960). This may be one reason for the mandatory rather than discretionary nature of awards of attorney's fees in successful suits to collect fringe benefit contributions under ERISA, 29 U.S.C. § 1132(g)(2)(D).

 In this context, even-handed and reliably firm collection of sums due for fringe benefits is important to maintaining a level playing field for employers. If one competitor can postpone such payments and thus underbid a rival, that rival may be injured in the marketplace in the same way it would have been injured if its competitor had arranged for lower wages or other reduced labor costs through an overt sweetheart arrangement.

These factors militate in favor of strict enforcement of the obligation to make wel-

---

**5.** An excellent example may be found in the use of mandatory minimum sentencing for narcotics

offenses prior to 1970, leading to repeal of former 21 U.S.C. § 174 by 84 Stat. 1291 (1970).

fare fund contributions, as sought by the Funds here.

### III

■ Inability to pay, although alleged in Roman's answer to the complaint, is not a defense in a debt collection case unless some contract provision or statute makes it so.[6] Financial difficulties may form a basis for agreed or judicially crafted payment arrangements if adequate to protect the creditor and hence beneficial to both parties, and, in an ERISA fund debt collection case, if not unduly favorable to a given employer.

■ Entry of judgment for a debt does not automatically mean that all potential collection devices are immediately available regardless of circumstances. New York Civil Practice Law & Rules § 5240, like the persuasive if not directly applicable Federal Debt Collection Procedures Act, 28 U.S.C. § 3013, permits courts to supervise such devices.

■ This authority might be exercised if there would be a greater probability of payment of the employer's delinquent fringe benefit contributions through a workout. It may also be significant where execution on a judgment would be likely to lead to loss of the economic activity represented by the employer without securing full payment.

Compelling recourse to the expensive procedure of Chapter 11 reorganization with its negative effects on others is not necessarily the optimum outcome, as reflected in the well-known fact that creditors in both business and consumer cases frequently and routinely negotiate workouts once the amount due is agreed to or established by judicial decision.[7]

Creating a loophole permitting groundless efforts to delay payment would encourage misuse of the flexibility accorded by CPLR § 5240. In this case, counsel for the Funds has submitted an uncontradicted statement that a check for agreed partial payment had been sent to my chambers rather than to the Funds, causing delay in retransmission, and was thereafter returned by the bank on which drawn because of insufficient funds. Under these circumstances, judicial intervention to seek to mitigate effects of ordinary collection processes would be inappropriate.

### IV

The Funds have submitted billing sheets showing legal fees of $3,287.50. The total amount due the Funds is slightly in excess of $10,000; a significant portion of the legal expenses claimed by counsel for the Teamsters Fund relate to the cost of settlement discussions.

■ Paragraph 9 of the Fund affidavit ("¶ 9") states that similar billing sheets were accepted in numerous cases in the United States district court, cited by docket number and not referred to in the Fund's memorandum of law.

These cases are not cited to the Federal Supplement, Federal Rules Decisions, LEXIS, WESTLAW or any other published source, nor are copies of any rulings in them provided to me or to Roman's counsel. One of these unpublished and unprovided rulings was affirmed by the Second Circuit in an unpublished 1988 decision cited in ¶ 9 of the Fund affidavit at p. 5. The affidavit appears to ignore Rule 0.23 of the Rules of the United States Court of Appeals for the Second Circuit, limiting citation of such decisions, without explaining why Fed.R.Civ.P. 1, 61 or other authority or exigencies would justify an exception in the interests of justice.[8]

---

**6.** See *Derecktor v. Norkin,* 820 F.Supp. 791 (1993).

**7.** A consumer credit counselling industry has developed to take advantage of the willingness of many creditors to work out debts rather than to force debtors into bankruptcy, and has received Congressional recognition in 15 U.S.C. § 1692a(6)(E), providing an exemption from the Fair Debt Collection Practices Act. The most widely known member of the industry in New

York is the Budget and Consumer Credit Counselling Service ("BUCCS").

**8.** See *Cecere v. County of Westchester,* 814 F.Supp. 378, 380 & n. 3 (S.D.N.Y.1993). Those Circuits which permit citation of such unpublished decisions in unrelated cases require (a) that they be cited only when they represent the best authority available and (b) that copies be furnished to the adversary and to the court. See,

The purpose of inclusion of these relatively inaccessible district and circuit court citations is obscure.[9] It may be that the objective of these references is to suggest that I should routinely approve the amounts set forth in ¶ 9 without further scrutiny of its reasonableness.

If that is the purpose for which these citations were provided, however, there is nothing to suggest that the courts involved considered any attorney's billing sheet more than a reflection of the work done and amounts routinely charged for it, or that such bills were not subject to the scrutiny routinely required where reasonable attorney's fees are to be determined. Indeed, I make the assumption that the judges sitting in the cases cited did review the reasonableness of the fees claimed, merely treating the billings as business records admissible under Fed.R.Evid. 803(6).

■ The Fund affidavit further states that the fees sought:

... are awardable by the court in the sound exercise of its discretion in view of:

(a) Defendant's *clear and inexcusable culpability* in this matter;

(b) the fact that it would be grossly inequitable to require Plaintiffs to absorb the cost of Defendant's *clear and intentional* disregard of its contractual and legal responsibility;

(c) the fact that an award of attorneys' fees will prove a deterrent to delinquencies on the part of this employer and other employers.

(emphasis added).

■ These conclusory statements cannot possibly be made on personal knowledge. There is no indication that they are made on

information and belief, or what basis, if any, there may be for reaching such conclusions as of the time this fee application was submitted.[10] Roman's answer candidly conceded that the amounts claimed are due, and adds as an extenuating circumstance, although not as a defense, that the delinquency was due to inability to pay.

It is mandatory that reasonable fees be awarded pursuant to 29 U.S.C. § 1132(g)(2)(D) and I do so in this case, albeit granting the full amount sought only because of special circumstances and with the caveat that no further applications would be appropriate based on additional expenses in connection with the current application.

V

■ Debt collection suits in which a predefined monetary amount due is sought have long been recognized as having unique characteristics differing from other kinds of litigation. Attorney's fees in that context are subject to particularly exacting review. See *First National Bank of East Islip v. Brower*, 42 N.Y.2d 471, 398 N.Y.S.2d 875, 368 N.E.2d 1240 (1977); *Mead v. First Trust & Deposit Co.*, 60 A.D.2d 71, 400 N.Y.S.2d 936 (4th Dept.1977).

In this federal question debt collection case arising under a federal statute, the most recent Congressional enactment relevant to the issue at hand is particularly persuasive authority. The Federal Debt Collection Procedures Act, Public Law 101–647, 104 Stat. 4937 (1990), enacted 28 U.S.C. § 3011 which provides in debt collection suits by the United States for a surcharge of ten per cent (10%) of the amount of the debt involved where other measures of recompense for

---

e.g., Fourth Circuit Internal Operating Procedure 36.5; Sixth Circuit Rule 24(c).

**9.** I do not assume that the primary thrust of the above comments should be laid at the feet of the attorney signing the Fund affidavit. A pre-prepared boilerplate document rather than merely an individual decision of the attorney involved appears to be responsible. The identical language appears in ¶ 9 of a similar affidavit seeking attorney's fees in *Schueler v. Rains & Welsh &*

*Sons*, 93 Civ. 1338 (VLB), sworn to April 15, 1993.

**10.** *Harsh unsupported statements in litigation papers are sometimes included to indicate to a client that the attorney is vigorously representing the client's position. It is the attorney's duty to resist such pressures. Failure to do so erodes the credibility of the affidavits involved.* Tetra Technologies v. Harter, 823 F.Supp. 1116 (S.D.N.Y.1993); Jones v. Wide World of Cars, 820 F.Supp. 132 (S.D.N.Y.1993).

governmental expenses are not applicable. The 10% surcharge is independent of whether litigation occurs or how much time is or is not spent by government attorneys. The surcharge cannot be added to otherwise available legal fees, but replaces all other charges where it is applicable.

Although not binding in non-governmental cases or where attorney's fees are separately authorized, the importance of protection of federal funds extant in 1990 as well as currently, and the sponsorship of the legislation by the Executive Branch, assure its fairness as a persuasive model for interpreting provisions seeking recovery of costs of debt collection, because the interest of both creditors and debtors were carefully considered through hearings and committee deliberations. See H.Rep. 736, 101st Cong., 2d Sess., 1990 U.S.Code Cong. & Admin.News 6630; Senate Judiciary Committee, "Hearing before the Subcommittee on Courts and Administrative Practice on S. 1961," S.Hrg. 199–1047, 100th Cong., 2d Sess. (1988) ("Senate Hearings"); floor statement of Chairman Jack Brooks of the House Judiciary Committee, 136 Cong.Rec. H 3288 (daily ed Oct. 27, 1990).

The objectives of the ten percent flat-surcharge benchmark in federal debt collection suits was discussed in the Government's Statement filed with the Senate Judiciary Committee in connection with § 3014 of the predecessor of the 1990 Act, S.1961, 100th Cong., 2d Sess. (1987), and cited in Senate Hearings at 196, 199. The choice of the flat fee approach, supported by the United States as creditor, of the flat fee approach was explained in the Government's Statement in part as follows:

... no defendant will be penalized for contesting a claim by incurring additional costs, thus exerting a chilling effect on the exercise of the defendant's constitutional right to a day in court.

The constitutional dimension of the issue mentioned in the Government's Statement is attested to by numerous decisions, e.g., *Bates v. Arizona,* 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810 (1977);

*Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494–95, 52 L.Ed.2d 72 (1977); *United Transportation Union v. State Bar of Michigan,* 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Chambers v. Baltimore & Ohio R. Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907).

The amount at stake in a litigation is a crucial determinant of the reasonableness of a fee award. See *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (nominal damages absent obtaining of injunctive relief do not ordinarily support award of fees to prevailing party); see also *Diamond D. Enterprises USA v. Steinsvaag,* 979 F.2d 14 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). The Federal Debt Collection Procedures Act is in accord with that concept, and confirms that in the debt collection context the relationship of fee to principal amount at stake should ordinarily be closer to one to ten (1 to 10) than to one to one (1 to 1). This is so because of the greater simplicity of the issues in most instances, the predictability of the amount recoverable absent a valid defense, and the ability of the creditor to build the cost of collection into the original contract (or in the alternative because of the presence of a provision for a contractually or statutorily determined flat collection fee). The 1990 Federal Act also suggests that the amount involved, not the amount of work done by the creditor, should be the principal measure of reasonable attorney's fees in the debt collection context.

The ten per cent (10%) flat fee concept for debt collection cases set forth in 28 U.S.C. § 3011 is a persuasive benchmark where applicable to the facts. It is not binding in the statutory fee-shifting context of 29 U.S.C. § 1132. I consider it as a factor but not an exclusive or determinative one.

As in applying sentencing guidelines[11] the starting point suggested by 28 U.S.C. § 3011 must be evaluated in light of

11. See *United States v. Merritt,* 988 F.2d 1298 (2d Cir.1993), *cert. denied* —— U.S. ——, 113 S.Ct.

2933, 124 L.Ed.2d 683 (1993); *United States v. Caruso,* 814 F.Supp. 382 (S.D.N.Y.1993).

the circumstances of the case, including those circumstances which are unforeseen. It would be inapplicable, for instance, if substantial litigation as to liability or efforts to trace hidden assets [12] were involved.

Nor can it be assumed that Congress in enacting 28 U.S.C. § 3011 contemplated that a significant portion of federal debt collection suits brought in the district courts would involve what might be deemed federal small claims cases in which the underlying amounts in dispute are as small as those in this litigation.[13] Transaction costs do not decline as rapidly as the subject matter of transactions. I therefore treat the 28 U.S.C. § 3011 criterion as suggesting that in even a small debt collection suit a fee approximating one third of the amount in dispute would ordinarily be excessive, but not as suggesting that a fee as small as the ten per cent appropriate for larger cases would necessarily be sufficient to permit effective collection to proceed. Such dilemmas can best be avoided by resort to arbitration or other means of resolution where possible, as discussed in part X below.

Apart from the persuasive relevance of 28 U.S.C. § 3011, I conclude on the basis of my experience that in an ordinary debt collection suit, a legal fee in the range of ten per cent to be recovered by a creditor where authorized by statute or contract would normally be reasonable. Where the debt is small, in the range of $15,000 or less, an amount significantly above 10% but substantially less than one-third would ordinarily be in accord with "the degree of effort reasonably needed to prevail in the litigation." *Smiley v. Sincoff*, 958 F.2d 498, 502 (2d Cir.1992).

This is not an entirely ordinary case. It appears that defendant Roman has taken advantage of leeway provided by the Funds and the court to delay payment, and has submitted partial payment against an account lacking sufficient funds, and without the courtesy of advance notice, an explanation, or a substitute valid check.[14]

## VI

A legal fee recoverable by the creditor in the range suggested by 28 U.S.C. § 3011 and the *Smiley* approach in the ordinary situation involving a small underlying debt of approximately $10,000 would only slightly exceed 10% of the debt and could be reached here by eliminating from the fee award amounts related to settlement negotiations. I would do so were it not for the troublesome behavior of the defendant Roman in issuing a check in partial payment drawn on an account it should have known would be insufficient.

This act, which suggests irresponsibility in defendant's conduct of settlement negotiations, justifies me in permitting the Funds to recover the costs of their side of those negotiations pursuant to ERISA, 29 U.S.C. § 1132(g)(2)(D), notwithstanding the inappropriateness of fee shifting of settlement costs in an ordinary debt collection case.

In *Banca Della Svizzera Italiana v. Cohen*, 756 F.Supp. 805, 809 (S.D.N.Y.1991), Judge Sweet rejected a claim for attorney's fees in a debt collection case, stating:

> Negotiations in pursuit of a settlement whereby the parties agree to a restructuring of the payments are not so much the enforcement of the original rights as a reformulation of those rights in a new agreement.

In *National Union Fire Insurance Co. v. Hartel*, 782 F.Supp. 22, 25 (S.D.N.Y.1992), *aff'd without published opinion* 972 F.2d 1328 (2d Cir.1992) (Table), Judge Stanton disagreed on the ground that denial of costs of settlement efforts "would discourage the pursuit of settlements, and such fees do not

---

12. See Fed.R.Civ.P. 69, 70.

13. See *Dickman v. FDR VA Hospital*, 148 F.R.D. 513 (SDNY 1993); *Shea v. Road Carriers Local 707 Welfare Fund*, 818 F.Supp. 631 (SDNY 1993).

14. The phenomenon of irresponsible issuance of checks against accounts with insufficient funds must be taken seriously in light of legislative recognition of the importance of the problem by means of N.Y.Gen.Oblig.Law § 11–104, added by L.1985, ch. 921 (providing that additional liquidated damages are available where drawers of a check know or should know that an account lacks sufficient funds).

appear to be a type of expense not customarily reimbursed (citations omitted)".

Judge Stanton's approach avoids a rigid ban on reimbursement of settlement costs in contexts where such reimbursement has been customary, and where denial of reimbursement would discourage settlement efforts. Where granting an award of legal fees for settlement efforts to one side at the expense of the other would have a chilling effect on settlement efforts, Judge Stanton's reasoning would suggest caution in imposing fees for settlement expenses incurred by an opposing party.

Application of this concept takes into account the type of case involved. Statutory fee-shifting provisions have been interpreted to embrace the cost of settlement efforts in some 42 U.S.C. § 1983 or similar suits. They normally do not embrace that cost in actions which involve an ongoing self-supporting activity which can generate funds to pay for settlement aspects of litigation, or where provision has been made for a flat delinquency fee. See, e.g., *Veterans Education Project v. Secretary of the Air Force,* 515 F.Supp. 993 (D.D.C.1981).

In a debt collection context collection expenses are part of the costs of a routine, repetitive cash-generating function. The reasoning behind 28 U.S.C. § 3011, discussed in part V above, would indicate that debtors who do not pay their bills should contribute to the cost of collection of their delinquencies. That statute and its legislative history indicates that they should do so through a fee based entirely or primarily on the amount involved, and generally in the range of 10% or slightly higher where the underlying debt is small, rather than being penalized for unsuccessfully questioning all or part of their liability or unsuccessfully seeking a payment arrangement in good faith (not clearly present here).

■ Constitutional questions might be raised if a fee-shifting statute were interpret-

ed in such a way as to have a chilling effect on the ability of a debtor to ask to discuss the debt without incurring additional costs payable to the creditor. A one-sided deterrent to taking legitimate positions, such as that of requesting settlement discussions in a debt collection case, must be justified by strong legitimate interests deliberately invoked. See *Bankers Life & Casualty Co. v. Crenshaw,* 486 U.S. 71, 82–85, 108 S.Ct. 1645, 1652–54, 100 L.Ed.2d 62 (1988); *Rankin v. Independent School District,* 876 F.2d 838, 839–42 (10th Cir.1989), *cert. denied* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991).

## VII

■ Fed.R.Evid. 408 forbids use of the content of settlement discussions in consideration of the merits of controversies. The Rule avoids distortion of judicial evaluation of the merits of cases because of settlement postures which may flow from other considerations entirely apart from the strength of a party's claim or defense. The Rule also protects settlement negotiations themselves from distortion because of posturing designed to set the stage for arguments on the merits based on what was or was not said.

Similarly, consideration of opposing recitations of settlement discussions in connection with claims for legal fees based on them would lead to self-serving statements during such negotiations for the purpose of setting the stage for victory in any ensuing fee controversy.[15] In determining the proper attorney's fee due under 29 U.S.C. § 1132(g), I decline to consider narratives submitted by either party concerning settlement negotiations in this case.

I do, however, consider the behavior of the defendant Roman in paying a deferred payment amount by means of a check against an account with insufficient funds, inconsistent with effective settlement efforts. Against this background, which I infer relates back to the period of any prior settlement discussions,[16] it would be inappropriate to deny an

---

**15.** See generally Forkosh, " 'Take It or Leave It' as a Bargaining Technique," 18 Labor L.J. 676 (Nov. 1967).

**16.** See *Eatz v. DME Unit of Local Union No 3,* 794 F.2d 29 (2d Cir.1986); *Phoenix Canada Oil*

*Co. v. Texaco,* 842 F.2d 1466, 1478 (3d Cir.), *cert. denied* 488 U.S. 916, 109 S.Ct. 273, 102 L.Ed.2d 262 (1988).

award of attorney's fees to the Funds for time spent in settlement negotiations.

## VIII

 In assessing the proper attorney's fee in this case, I consider:

(a) the amount involved, here relatively small (in the range of $10,000);

(b) contest or lack of contest as to the underlying amount due or the need to trace hidden assets;

(c) the issues in dispute, here merely the question of legal fees itself, and Roman's ill-fated effort to delay payment;

(d) the relationship between the amount involved and the appropriate fee in a debt collection case suggested by 28 U.S.C. § 3011, normally in the range of 10% in a case involving a larger amount;

(e) the importance of collection of fringe benefit contributions pursuant to 29 U.S.C. § 1132;

(f) the risks of penalizing defendants in debt collection suits for engaging in settlement efforts by requiring them to pay the adversary's fees for such discussions;

(g) whether the fee appears out of line for a case of the type involved (see *Smiley v. Sincoff,* 958 F.2d 498, 502 [2d Cir.1992] ); and

(h) the conduct of the litigation by both sides.[17]

 A minor victory cannot ordinarily support an award of full legal fees. *Farrar v. Hobby,* —— U.S. ——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). Prevailing on a single subordinate issue such as legal fees alone might by itself be insufficient to secure a substantial award under a fee-shifting statute, much less one embracing the cost of settlement negotiations. See *Roanoke River Basin Ass'n v. Hudson,* 991 F.2d 132 (4th Cir.1993); Callier, "When the Winning Party is Not the Prevailing Party," 66 Tul.L.Rev. 2067 (June 1992).

But for the conduct of the defendant Roman as discussed above, eliminating the portion of the claim relating to settlement would reflect several of the above factors. This would include the ratio of fee to claim suggested by 28 U.S.C. § 3011, protection of settlement processes in debt collection suits, the nature of the papers submitted by the Funds in support of the application before me, and the nature of the issues litigated in relation to the fee claimed.

## IX

 Roman claims in an affidavit of its attorney Richard Sulzman, Esq., filed in support of its cross-motion, that a settlement was reached. Roman bases this assertion on an unquoted oral telephone conversation with an attorney in the law firm representing the Funds.[18] No exact date or time of day is given, nor are any notes attached to the affidavit. No confirming letter was sent to counsel for the Funds, nor was any follow-up agreement drafted for signature. The court was never notified in writing of the asserted settlement of this case until the filing of Mr. Sulzman's affidavit in support of a cross-

---

**17.** Roman makes several detailed criticisms of particular expenditures of time on the part of Fund counsel. Some of these may arguably have merit in the context suggested by the nature of the Funds' papers as discussed in part IV above.

At the same time, Roman's issuance of a check against an account with insufficient funds suggests irresponsibility in settlement negotiations and necessarily imposed additional post-application legal costs on the Funds.

I find it appropriate to set off these contentions against each other, also taking into account the costs of this fee application, the nature of the Funds' papers referred to in part IV above, and the weakness of Roman's counterclaim in a manner which might be employed where equally justified sanctions under Fed.R.Civ.P. 11 or 28 U.S.C. § 1927 against both sides are such that neither should benefit. *Donaldson v. Clark,* 786

F.2d 1570 (11th Cir.1986), *modified* 819 F.2d 1551 (11th Cir.1987) (en banc); *Laitram Corp. v. Cambridge Wire Cloth Co.,* 919 F.2d 1579 (Fed. Cir.1990).

**18.** Disputation appears to have arisen concerning whether the attorney for the Funds involved might have had less authority because of her role as an associate in the law firm at the time. I reject this contention. It is not the role of adversaries or the judiciary to determine the most efficient degree of delegation of authority within an organization. See *Dollar Dry Dock Bank v. Denning,* 148 F.R.D. 124 (S.D.N.Y.1993); *Allbrand Appliance & Television Co. v. Advent Corp.,* 1978–2 Trade Cases (CCH) ¶ 62,371 1978 WL 1446 (S.D.N.Y.1978).

motion resisting the Funds' motion for summary judgment.

Checks issued by Roman[19] were relied upon by Roman as indications that a settlement had already been reached. These prior checks were attached as Exhibit A to Roman's cross-motion. Those documents contain no notation that they were submitted as part of any settlement. They may well have reflected additional payments subsequently due, or payments of earlier obligations (conceded by Roman's answer to the complaint), made to reduce Roman's liability.[20]

The nature of this ERISA fringe benefit collection case under 29 U.S.C. § 1132 suggests caution in granting credence to claims of a binding informal oral settlement of sums due to employee benefit funds.[21] For an employee welfare fund to make a commitment intended to be binding with an employer without memorialization in writing strains credulity; judicial enforcement of such a commitment would permit ready obstruction of collection of amounts due such funds and run counter to the implications of national labor policy. See *Eastern Air Lines, Inc. v. Air Line Pilots,* 861 F.2d 1546, 1552 (11th Cir.1988).

Enforcement of settlements of litigation is customarily based upon client signature, stipulation so-ordered by the court,[22] or stipulations entered into between counsel on the record. Without one or more of these protections, unreliability of the kind leading to enactment of Statutes of Frauds[23] would frequently cause mischief, and tentative agreements would be transformed into binding oral settlement discussions with great harm to the legal process, including the objectives of Fed.R.Civ.P. 1, sentence 2 and of the Judicial Improvements Act of 1990, Public Law 101–650, 104 Stat. 5089, enacting 28 U.S.C. § 473. See *Turner v. Burlington Northern RR,* 771 F.2d 341, 345 (8th Cir. 1985); *Surety Ins. Co. v. Williams,* 729 F.2d 581, 582–83 (8th Cir.1984).

▪ Vague conclusory statements in an affidavit of opposing counsel that an agreement to do something was reached, unless corroborated, are thin reeds with which to seek to hold an opposing party bound. See *Berry v. Midtown Service Corp.,* 104 F.2d 107 (2d Cir.1939); *Licata & Co. v. Goldberg,* 812 F.Supp. 403 (S.D.N.Y.1993).

▪ Judicial caution is necessary with respect to dubious claims of oral agreements without adequate support because "stability and predictability in contractual affairs is a highly desirable jurisprudential value." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 336, 514 N.Y.S.2d 209, 213, 506 N.E.2d 919, 923 (1987).

Enforcement of claimed attorney-to-attorney settlements, without written, on-the-record or court-approved agreement of the type involved in *In re Anthony Sicari,* 151 B.R. 60 (S.D.N.Y.1993), would engender risks that efforts would be made to translate tentative suggestions discussed between opposing counsel into binding commitments. This would chill the informal atmosphere necessary to realistic settlement efforts. Every word said would have to be judiciously considered in advance to weigh how it might be misconstrued or twisted thereafter. Careful notes would have to be taken of every comment by any party. Attorney testimony with accompanying risks of disqualification would likewise become more prevalent.

▪ Litigation cannot be conducted effectively unless opposing counsel are empowered to attempt to work out contested mat-

---

**19.** These checks were issued prior to Roman's issuance of the ill-fated check as to which payment was refused by the bank after the current motions were fully submitted to me.

**20.** There appears to be no contention on Roman's part that the sums totalling $3,000 reflected in Exhibit A to Roman's papers should be deducted from the amounts claimed in the Funds' motion for summary judgment.

**21.** See authorities discussed in part II above.

**22.** See *In re Anthony Sicari (M & G Promo Services),* 151 B.R. 60 (S.D.N.Y.1993).

**23.** Despite judicial vigilance to prevent their misuse, statutes of frauds have long been and still are recognized as serving an important purpose. See *Ginsburg Mach. Co. v. J. & H. Label Processing Corp.,* 341 F.2d 825, 828 (2d Cir.1965); *Beers v. Hotchkiss,* 256 N.Y. 41, 175 N.E. 506 (1931); and see generally, e.g., N.Y.Gen.Oblig.Law § 5–701.

ters by means of preliminary agreements, not to be deemed binding unless put in writing, recorded on the record, or so-ordered by the court. Attempts to transform informal discussions between counsel for adversary parties into binding commitments are destructive of this process. It is just as important that parties not be subjected to unintended commitments as that solemn agreements be honored. See *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir.1985); *RG Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69 (2d Cir.1984); *TIAA v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987).

It is improper for counsel to disregard customary practices of the Bar which are vital to "the just, speedy, and inexpensive determination of every action" sought by Fed.R.Civ.P. 1, sentence 2. Among these time-honored and critical practices is the ability to discuss possible settlements informally without risking that the negotiations will be cited as proof of actual commitments. As stated in *Roberts v. Lyons*, 131 F.R.D. 75, 83 (E.D.Pa.1990), quoting Canon 25 of the Canons of Professional Ethics: "a lawyer should not ignore known customs or practices of the Bar ... without giving timely notice to opposing counsel."

Where, as here, a claim is "implausible" and no additional evidence to support it is provided, summary judgment dismissing it can be granted. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## X

Increasing numbers of cases involving issues of importance to the parties but concerning relatively small amounts have been brought into the federal courts in recent years under several statutes, including ERISA (see 29 U.S.C. § 1132) and the general federal question jurisdictional provision (28 U.S.C. § 1331).[24] Despite their intrinsic significance to those affected, many of these cases cannot support the amount of time invested in them when counsel treats them in the same manner as disputes involving far larger monetary stakes.[25]

The objectives set forth in Fed.R.Civ.P. 1 (the speedy, just and inexpensive determination of every action) require enhanced efforts in this context. In this instance, national labor policy speaks to the question in § 201 of the Labor–Management Relations Act of 1947 (Taft–Hartley Act), 29 U.S.C. § 171:

> (a) sound and stable industrial peace and the advancement of the general. welfare, health, and safety of the Nation and of the best interests of employers and employees can most satisfactorily be secured by the settlement of issues between employers and employees through the processes of conference and collective bargaining between employers and the representatives of their employees ...

This Congressional policy is reflected in the interpretation of § 301 of the Taft–Hartley Act (29 U.S.C. § 185) as authorizing federal judicial enforcement of arbitration clauses in collective bargaining agreements. See *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers · v. Warrior & Gulf Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Co.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (the "Steelworkers trilogy"); see also *Boys Markets, Inc. v. Retail Clerks*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). This policy is also reflected in the United States Arbitration Act (Title 9, United States Code).

24. Many of these cases are within the concurrent jurisdiction of federal and state courts even though federal substantive law controls. That is true under ERISA and § 301 of the Taft–Hartley Act (29 U.S.C. § 185), inasmuch as Congress has not provided for exclusive federal judicial jurisdiction. *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962); see *The Federalist No. 82* (Hamilton).

25. See *Shea v. Road Carriers Local 707*, 818 F.Supp. 631 (S.D.N.Y.1993); *Dickman v. FDR VA Hospital*, 148 F.R.D. 513 (S.D.N.Y.1993); *Derico v. IBM*, 1993 WL 106799, 1993 U.S.Dist. LEXIS 4546 (S.D.N.Y. 93 Civ. 0823, April 6, 1993).

Arbitration under procedures agreed upon between labor and management does not have any flavor of one-sided structuring of the rules or selection of the arbiters.[26] None of the risks of unfairness is involved such as those presented by pre-dispute commitments to arbitrate contained in the fine print of documents signed by parties of unequal legal sophistication.[27]

Employee benefit plan fiduciaries and their constituent employer and labor representatives widely recognize the benefits of arbitration of delinquency disputes in lieu of initial litigation of each such matter. The trustees of ERISA plans frequently have discretion to employ arbitration or litigation to collect delinquencies. The less expensive arbitration route is thus often used to recover small undisputed amounts. Such arrangements take advantage of the knowledge of the industry, its problems, and means of efficient collection available to jointly selected named impartial umpires agreed upon by employer and union representatives. See Panel Discussion, "Unique Problems and Opportunities of Permanent Umpireships," 42 National Academy of Arb., Proceedings, Ann. Meeting 176 (1990).

Such arbitration agreements generally provide that awards may be confirmed and judgment entered upon them in any court of competent jurisdiction. 9 U.S.C. § 9; see *Borden, Inc. v. Meiji Milk Products Co.*, 919 F.2d 822, 827 (2d Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 2259, 114 L.Ed.2d 712 (1991); *Oklahoma City Associates v. Wall–Mart Stores*, 923 F.2d 791 (10th Cir.1991); Stewart, "How to Construct Better Arbitration Clauses," 36 Prac.Law. No 8 at 79 (Dec. 1990).

▆▆▆ Where a fee application in excess of 10% of the underlying transaction is submitted in an employee benefit plan debt collection case in which no contest on the merits of the claim is involved and no need to trace

assets has arisen, I would expect the applicant to justify the fee sought by comparison to the cost of alternative means of collection such as arbitration.

SO ORDERED.

---

**26.** See *Commonwealth Coating Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

**27.** See 15 U.S.C. §§ 2301, 2302, 2309–10; 16 CFR § 703; *Ex Parte Warren*, 548 So.2d 157 (Ala.), *cert. denied* 493 U.S. 998, 110 S.Ct. 554, 107 L.Ed.2d 550 (1989); N.Y.Gen.Bus.Law § 399–c, discussed in Report, "Recommendations Regarding Use of Mandatory Arbitration Clauses in Consumer Contracts," 31 Record of The Ass'n of the Bar of the City of New York 356 (1976); compare generally Wiseman, "Karl Llewellyn and the Merchant Rules," 100 Harv. L.Rev. 465 (1987).