**WM. CHALSON & CO., INC., Plaintiff,**

v.

**AMALGAMATED JEWELRY, DIAMOND & WATCHCASE WORKERS UNION LOCAL NO. 1, I.J.W.U. (AFL–CIO), Defendant.**

No. 79 Civ. 4591.

United States District Court,
S. D. New York.

Oct. 17, 1979.

Richard Goldstein, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for plaintiff.

Robert Kruger, Sturm & Perl, New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

By complaint filed August 30, 1979, plaintiff Wm. Chalson & Co., Inc. (hereinafter "Chalson"), sought declaratory and injunctive relief against the defendant Amalgamated Jewelry, Diamond & Watchcase Workers Union Local No. 1, I.J.W.U. (AFL–CIO), (hereinafter "the Union") to prevent the conduct of an arbitration, more particularly described below, and to: (1) declare that plaintiff is not a party to or bound by the provisions of a collective bargaining agreement between the Union and Associate Jewelers, Inc., dated as of March 21, 1979, described below, or by any agreement to arbitrate any disputes or grievances with the Union; (2) enjoin the Union permanently from instituting or proceeding further with any arbitration against plaintiff pursuant to the March 21, 1979 agreement; and (3) grant such other, further and different relief as plaintiff may be entitled to receive in this action.

By motion docketed September 11, 1979, Chalson moved for a preliminary injunction enjoining the Union from proceeding with a Demand for Arbitration against plaintiff, on the ground that there was no contract between plaintiff and defendant requiring arbitration between the parties. By a document entitled as a Notice of "Cross-Motion," docketed September 18, 1979, the Union moved for an order pursuant to 9 U.S.C. § 4 which order would (1) compel plaintiff to proceed to arbitration under a certain collective bargaining agreement as demanded by defendant in its Demand for Arbitration; and (2) dismiss the action; and (3) grant such other and further relief as may be proper.

At the hearing on these motions held before me on October 4, 1979, no formal transcript was taken. Counsel for both parties, however, although they dispute the inferences to be drawn from the uncontested facts, agreed in open Court that there is no contested issue of fact and no necessity for an evidentiary hearing in this Court. It was also conceded that the arbitration had been demanded to take place on October 24, 1979, and that the American Arbitration Association had declined to adjourn the arbitration, except upon receipt of a court order. Counsel agreed that affidavits submitted by both sides could be considered, and that the motions would be regarded as made for permanent relief in the nature of Summary Judgment, pursuant to Rule 56, F.R.Civ.P.

It was also conceded at oral argument that the contract under which arbitration was sought is an instrument which was executed and ratified by the Union on April 21, 1979, but dated as of March 21, 1979, the date as of which the new wage scales therein set forth were to be effective. Counsel agree that arbitration is not now being sought under the prior collective bargaining agreement which expired on February 28, 1979, although a superficial examination of the documents submitted might suggest otherwise.

The Court has subject matter jurisdiction of this action pursuant to 29 U.S.C. § 185, as well as 9 U.S.C. § 4 and 28 U.S.C. § 1331.

Stated below are undisputed facts. The Union has represented the production employees of the plaintiff as their collective bargaining agent since at least 1935. Plaintiff is a manufacturing jeweler in the fine diamond and precious metal branch of the industry. It has approximately nine employees engaged as full-time and regular part-time polishers, stone setters, jewelers and waxers. Plaintiff's office and clerical employees, professionals, guards and supervisors were never represented by the Union.

There are in excess of fifty small manufacturers of fine, high quality jewelry, sold to premium retail stores, which are located in the New York City area, and conduct manufacturing operations similar to those of plaintiff. For at least twenty years, these manufacturers engaged with this Union in what the Court for convenience will describe as joint "industry-wide bargaining" through Associate Jewelers, Inc. (hereinafter the "Association"), which in turn acted jointly with a companion group, Jewelry Manufacturers Association, Inc. As a result of this multiemployer collective bargaining between the Association and the Union, a labor contract ("the old contract") came into existence, which regulated the relationships between plaintiff and the Union. The Union gave notice in writing to the Association by letter dated December 11, 1978, of its intention to terminate the old contract as of February 28, 1979, the date on which it expired by its own terms, and to negotiate a new agreement. The Associations urged their members to "lock-out" the rank and file members of the Union effective March 1, 1979. Many did so, and the locked-out union members organized picket lines at the respective premises. Chalson, however, did not actually lock-out its employees at any time. After one or two hours of work lost on March 1st because the employees thought they were locked out, Chalson's business opened, and remains open, employing the same persons as in February.

Collective bargaining between the two employer Associations and the Union began

on March 7, 1979, and negotiating sessions were held on the 9th, 14th, 16th, 20th, 22nd and 28th of March, and on April 5th, 10 and 16th of 1979. On the 16th of April, the settlement was agreed to between the bargaining teams, resulting in a contract which was ratified by the rank and file on April 21st, and as noted above, was dated as of and became effective for purposes of wages and fringe benefits, retroactively to March 21, 1979.

Prior to March 16, 1979, the negotiations had deteriorated to a point beyond that usually experienced in the skilled trades. The depth and degree of divisiveness existing between the Union and the "bosses" over the terms of the new contract is made clear by reference to Vol. 1, No. 1 of a so-called "Information Bulletin" dated March 13, 1979, issued by the Executive Board of the Union, and distributed to its members. Couched in the rhetoric of forgotten union-management struggles of the 19th century, the Bulletin describes the then current state of the dispute. We reproduce it herewith with its original format:

Dear Member:

Some bosses have been telling you half-truths about the mediation and contract negotiations. HERE IS THE REAL TRUTH!

1. The bosses want us to return to the eight-hour day and forty-hour week. *WE SAID NO!*

2. The bosses want to change jewelers and polishers classifications and reduce their minimums. *WE SAID NO!*

3. The bosses want to institute a speed-up piece work system in all crafts. *WE SAID NO!*

4. The bosses want to change Call-in-Time from a full day's pay to a half day's pay. *WE SAID NO!*

6. [*sic*] The bosses want to add a section to the contract on Management Rights which would infringe on rights that you and the Union now enjoy. *WE SAID NO!*

7. The bosses want to severely limit and reduce the Cost of Living Clause. *WE SAID NO!*

8. The bosses want to raise the Major Medical deductible from our present $25 per individual and $50 per family to $100 per individual and $200 per family. *WE SAID NO!*

9. The bosses refuse to give us any Bereavement Pay.

10. The bosses refuse to give us any Sick Leave Pay.

11. The bosses refuse to give us a fair wage offer; a change in the contract date; equal distribution of overtime; fair increases in Pension, Welfare Insurance; Severance Pay; a Fourth week Vacation; fair starting and Minimum Rates, etc.

The next time one of your bosses complains to you about being on the picket line . . remind him that "HE LOCKED YOU OUT OF THE SHOP" and that we will not give up what we fought for and won over the past 45 years.

We will continue to fight for a decent contract!!

WE ARE UNITED AND STRONG! WE WILL WIN!!

On March 16, 1979, taking the position that negotiations were at an "impasse," Chalson gave unilateral written notice to the Association and the Union that "effective immediately" it "withdrews" [*sic*] from the Associate Jewelers, Inc. which "previous to this Notice of Withdrawal had represented Wm. Chalson & Co., Inc. in negotiations with the [Union]." The notice further advised that "Wm. Chalson & Co., Inc. withdraws its designation of authority to the Association to represent it in any and all future negotiations with the Union. Wm. Chalson & Co., Inc. will not be bound by any collective bargaining agreement entered into subsequent to this Notice of Withdrawal between the Association and the Union."

Apparently Chalson thereupon ceased making contributions to the Union's welfare fund and pension fund for its employees. The employees continued to work;

plaintiff established its own employee benefits, and sought decertification from the NLRB, apparently without success.

On March 29, 1979, Chalson wrote the Union expressing a "good faith doubt" that the Union represented a majority of the employees, and declined to recognize it as a bargaining agent for the Chalson employees.

There is now pending an action in the Civil Court of the City of New York, County of New York to recover the unpaid contributions to both union funds. Unfair labor practice charges have been lodged by the Union and the Employer with the NLRB. Both remain unresolved. Neither is likely to be acted upon for some months.

Against this background, and denied prompt resolution of the dispute by the NLRB, the Union responded with this demand for arbitration before the American Arbitration Association. The nature of the dispute to be arbitrated was described as "violation of Article I: II: XXXII and other pertinent sections of the contract." The remedy sought was "a cease and desist of unlawful action: a return of the work to the bargaining unit, plus a make whole remedy for the affected employees, the Union and the welfare and pension funds."

While the demand for arbitration states that it is under a written contract dated March 21, *1977*, the parties agree that the arbitration is sought under the March 21, *1979* agreement signed on April 21st by the Association, after Chalson's March 16th withdrawal of authority.

While that agreement has not yet been printed and released, the arbitration clause therein is the same as in the prior contract. It provides in substance that any "complaints, disputes or grievances arising between the Association and the Union and/or between members of the Union and members of the Association, involving questions of interpretation of or application of any of the provisions of this Agreement, or any acts, conduct or relations between the parties and their respective members, directly or indirectly," shall, after internal grievance procedures have been exhausted, be submitted by either party to arbitration by an arbitrator designated by the American Arbitration Association in accordance with its rules. The agreement provides that the decision of the arbitrators shall be binding and conclusive on both parties.

■ The burden of persuasion to demonstrate to this Court that arbitration should be required rests upon the Union. The Union asserts that the March 21, 1979 agreement containing an arbitration clause "arguably applies" to the dispute in question, and therefore must be referred to arbitration pursuant to the strong policy favoring arbitration of labor disputes as expressed in the so-called "*Steelworkers Trilogy*." *Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); and *Steelworkers v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). New York law is even stronger on this point. *Matter of Riccardi*, 45 A.D.2d 191, 356 N.Y.S.2d 872, aff'd. 36 N.Y.2d 945, 373 N.Y.S.2d 551, 335 N.E.2d 856; *Matter of R. H. Macy & Co.*, 47 A.D.2d 518, 361 N.Y.S.2d 356, aff'd. 39 N.Y.2d 268, 383 N.Y.S.2d 562, 347 N.E.2d 887.

Further, the Union charges that "the attempted withdrawal by [Chalson] from its multi-employer bargaining unit after the onset of negotiations is so clearly ineffective . . . that the applicability of the recent agreement to the company and the binding effect of the agreement upon the company cannot be seriously questioned." (¶ 3 of the Affidavit of Joseph Tarantola, sworn to September 17, 1979).

■ The issue in a labor-management context is to be resolved by "federal law" notwithstanding that an agreement to arbitrate is facially a contract, to which *Erie* principles should apply. See *Nolde Bros. Inc. v. Local No. 358, Bakery, etc. Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977). We have been reminded recently, in *Rochdale Village Inc. v. Public Service, etc.*

*Union Local No. 80, etc.,* 605 F.2d 1290 (2d Cir. 1979), that:

> "Because the duty to arbitrate can be imposed only by contract, it often occurs that questions of contract termination must be decided in order to determine whether a party is under such a duty." [Footnote omitted].

■ If termination, *vel non,* of a collective bargaining agreement is not an issue which must be arbitrated thereunder, as held in *Rochdale, supra,* then, *a fortiori,* inception of such an agreement must be decided by the Court rather than the arbitrator. To hold otherwise would not only be illogical, and contrary to the principles stated in *Rochdale,* but might permit jurisdictional bootstrapping by an arbitrator. Here, stripped of its verbiage, what the Union really plans to arbitrate is whether Chalson is bound by the terms of the very March 21, 1979 labor agreement under which it seeks to arbitrate that issue. Clearly the Court must decide here whether Chalson has the duty to arbitrate.

■ Absent an impasse in negotiations or unusual circumstances, it is an unfair labor practice for an employer to withdraw, unilaterally, from multiemployer bargaining after negotiations have commenced. *NLRB v. Sheridan Creations, Inc.,* 357 F.2d 245 (2d Cir. 1966). In a proper case, the NLRB, but not this Court, has jurisdiction to issue a cease and desist order compelling an employer to accept and ratify an agreement reached after his withdrawal. An impasse has been defined as "synonymous with deadlock" and "akin to a hiatus in negotiations," during which the parties can and usually do resort to "economic pressure" such as a strike or lockout, which in turn usually breaks the stalemate and revives the duty to bargain. *Hi-Way Billboards, Inc.* and *Sign and Pictorial etc. Painters Local Union No. 550, etc.,* Supplemental Decision on Remand, September 18, 1973, 206 NLRB 1, pp. 22, 23 (1973), *enforcement denied sub nom. NLRB v. Hi-Way Billboards Inc.,* 500 F.2d 181 (5th Cir. 1974).

The facts set forth here do not compel the conclusion that there was an impasse on March 16, 1979. See, *Carpenter Sprinkler Corp. v. NLRB,* 605 F.2d 60 (2d Cir. 1979). No meetings were held from March 1, 1979, the first day on which there was no contract, and the date when the lockout began, until March 7, 1979 when the New York State Mediation Board called all parties to appear at its office. It is now customary for one or both parties to contract renewal negotiations to "terminate" the existing contract in a formal manner, so as to trigger the entry into the case of state and federal mediation officials. Apparently the psychodynamics of the negotiations are altered or improved in some way if the first session takes place under the mediator's auspices, and those services are usually not available until the contract is "terminated."

Between March 7th and March 16th, when Chalson purported to withdraw by reason of impasse, four negotiating meetings were held. No substantial progress or change of positions occurred, but it cannot be said that the parties were deadlocked. In an all-night meeting on April 5, 1979 "substantial progress" was made. Even at that point, the parties were substantially apart on many critical issues. Prior to March 16, 1979, in accordance with usual labor negotiation practices, certain issues as enumerated in ¶ 14 of Mr. Tarantola's affidavit, all of which were minor in nature, were agreed to, "without prejudice to either side, contingent upon resolution of the major issues and evolution of the negotiations into a final contract." (Quoted from Affirmation of Ira M. Berger, Esq., dated May 28, 1979, p. 4). This is customary in labor negotiations, and in view of the extravagant initial demands apparently made by both sides, the time required to reach a contract, *i. e.,* March 7th, through April 16, 1979, with a total of ten meetings, cannot be regarded as unusual, nor as evidencing any deadlock or impasse. See, *New York Printing Pressmen & Offset Workers v. NLRB,* 538 F.2d 496 (2d Cir. 1976); *Alexander Typesetting, Inc.* 207 NLRB 301 (1973); *Taft Broadcasting Co.,* 163 NLRB 475 (1967).

This Court does not pretend to adjudicate with finality whether or not the parties were in fact at impasse on March 16, 1979. Upon this disputed mixed question of law and fact depends the issue of whether or not Chalson's withdrawal from the employer unit was an unfair labor practice. It is better that the NLRB, with its presumed special expertise in such matters, should resolve the issue free from any prior expression by this Court. If it decides that issue favorably to the Union it may, but need not, require adherence (ratification) by Chalson to all of the terms of the March 21, 1979 contract, including the arbitration clause.

For our purposes we assume (as this Court would find and conclude were the issue properly before us) that Chalson's action of March 16, 1979 in withdrawing from the employer unit prior to an actual impasse, was unjustified, and an unfair labor practice. Even so, withdraw it did. On and after March 16, 1979, the Association had neither actual nor apparent authority either under general principles of agency law, or § 2(13) of the NLRA, to bind its principal, Chalson, because its agency had been terminated, albeit wrongfully. Under contract law, an agent whose authority as an agent has been terminated cannot thereafter bind the principal to an agreement to arbitrate or any other contract. See, *Rochdale Village, supra*, and cases therein cited.

Summary judgment is granted in favor of plaintiff. Settle a form of final judgment on five (5) days notice which shall declare the rights of the parties and enjoin any arbitration of issues between these parties pursuant to the contract dated as of March 21, 1979, between the Association and the Union permanently, without prejudice to the statutory jurisdiction of the National Labor Relations Board to make such other or different directions at a future time which it shall consider appropriate, and with leave to apply at the foot of the Judgment to compel arbitration, if and when Chalson is compelled by the NLRB to ratify or accept the multiemployer contract.

So Ordered.