TRUSTEES OF the HUDSON VALLEY DISTRICT COUNCIL OF BRICKLAYERS AND ALLIED CRAFTSMEN, RETIREMENT, WELFARE AND APPRENTICE TRAINING AND JOURNEYMEN UPGRADING FUNDS, and Hudson Valley District Council Bricklayers and Allied Craftsmen, Plaintiffs,

v.

U.W. MARX, INC., Defendant.

No. 93 Civ. 6572 (VLB).

United States District Court, S.D. New York.

May 3, 1994.

David R. Wise, Gellert & Cutler, Poughkeepsie, NY, for plaintiffs.

Gerald H. Katzman, Pattison, Samson, Troy, NY, for defendant.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

This case presents the questions of whether or not employers can be required to pay duplicate wages if they have hired workers not members of the correct union, and if not what remedies would be appropriate, as well as questions concerning what constitutes a withdrawal from an otherwise automatically self-extending collective bargaining agreement.

Plaintiff Hudson Valley District Council, Bricklayers and Allied Craftsmen ("District Council") and its associated welfare funds filed this suit against an employer, U.W. Marx, Inc. Plaintiffs seek relief under ERISA, 29 U.S.C. § 1001 *et seq.*, § 301 of the Taft–Hartley Act (29 U.S.C. § 185), and under state law. They base their claims

upon alleged delinquencies in employee benefit contributions, and upon the alleged violation by the employer of the collective bargaining agreements in hiring employees other than members of the District Council.

An original collective bargaining agreement was negotiated between the employer and the District Council in 1983. Other collective bargaining agreements between the employer and the District Council ensued in the course of which the employer delegated its bargaining functions to the Construction Contractors' Association of the Hudson Valley (the "Association"), which negotiated a 1990 contract (hereinafter the "collective bargaining agreement" unless otherwise indicated) which was operational at least up through May 31, 1993.

The collective bargaining agreement specified various percentages of employees to be hired from the membership of the District Council including a percentage from the area where the work was to be done. It contained a provision that it would be "automatically renewed yearly thereafter unless written notice of decision to negotiate a new Agreement ... is given in writing by Certified or Registered mail ... not later than sixty (60) days nor more than ninety (90) days prior to the expiration date or any anniversary date thereafter."

In this action, the District Council seeks the amount of wages its members would have received had those members been hired in place of others whom the employer had hired, allegedly in violation of the collective bargaining agreement. The total amount demanded in the original complaint was $9,799.61.[1] Plaintiffs thereafter moved to amend the complaint under Fed.R.Civ.P. 15(a) to add claims for additional sums based on additional work done by employees hired from sources other than the District Council, increasing the amount claimed to $75,287.90.

The employer responded by arguing (1) that the current collective bargaining agreement expired on May 31, 1993 because of prior termination pursuant to the provisions

---

1. The filing of lawsuits for amounts often involving smaller sums than the cost of litigation is counterproductive and suggests the need for further consideration of use of arbitration in the

first instance prior to applications for judicial relief absent special circumstances. See *Schueler v. Roman Asphalt,* 827 F.Supp. 247 (S.D.N.Y. 1993).

quoted above, and (2) that the relief sought by plaintiffs would be inappropriate even if the collective bargaining agreement had been violated. The latter question is pertinent whether or not the collective bargaining agreement in fact expired on May 31, 1993, since the complaint includes claims of violation prior to that date. Both sides have submitted factual material concerning these issues extending beyond the pleadings.

Counsel for the parties have agreed to the following:

(a) plaintiffs' motion to amend the complaint under Rule 15 be treated as granted;

(b) the employer's objections be treated as a motion to dismiss under Fed.R.Civ.P. 12(b)(6) which is converted into a motion for summary judgment under Fed.R.Civ.P. 56 by virtue of consideration of matter beyond the pleadings;

(c) the employer's Rule 12(b)(6) motion and plaintiffs' responses be treated as cross-motions for summary judgment with respect to the two issues mentioned above;

(d) the question of whether or not any collective bargaining contract provisions were actually violated is not before the court for determination at this time.

The parties' respective motions are granted to the extent of the following, and in all other respects denied:

(1) the collective bargaining agreement between the parties expired on May 31, 1993 unless plaintiffs can establish that the employer failed to notify the multi-employer association involved, resulting in confusion;

(2) sums are due to the plaintiff ERISA employee benefit funds for work, if any, performed by nonmembers of the District Council prior to May 31, 1993, and may be recovered by such funds;

(3) the District Council's request for relief for failure of the employer to pay to its members monies which would have been earned by them, assuming that the provisions of the collective bargaining agreements during their periods of effectiveness were not honored, may proceed subject to the conditions set forth in this memorandum order, including among other matters (a) the need to resolve the question of laches, and (b) determination of whether or not a jurisdictional dispute is involved and if it is, whether or not notice to or joinder of other unions is necessary.

Questions of whether the contracts were violated prior to May 31, 1993, and if so what remedy should be provided, remain open.

## II

The National Labor Relations Act, as amended by the Taft–Hartley Act of 1947, has as a major objective protection of the rights of employees to form and join labor organizations and to bargain collectively with their employers; employers in turn are required to bargain in good faith with duly chosen representatives of their employees. See 29 U.S.C. §§ 157–158. These rights, hard-won after decades of effort, are grounded in the ability of employees to choose their own representatives and in the obligation of employers to deal with those representatives. See R. Dulles, *Labor in America* (1949).

In most industries, the workforce is sufficiently stable to permit elections supervised by the National Labor Relations Board to function as the primary means of employee indication of choice of representatives, if any. See 29 U.S.C. § 159. The building and construction industry, however, has historically involved a large number of short-term jobs. This phenomenon both increases the cost of construction and has led to efforts to create greater job security through longer-term commitments which will both restrain costs and provide protection for employees. See sources cited, *Riddick v. Summit House*, 835 F.Supp. 137 (S.D.N.Y.1993); Federal Trade Commission, New York Regional Office, *Report on Hearings on Obstacles to Expansion of the Building & Construction Industry* (1973). In some instances, longer-term labor agreements are sought as part of a joint effort to increase productivity, employee job security, and union stability, thus ameliorating the need for strict application of traditional but expensive job-preserving work rules. See *Building & Construction Trades Council v. Massachusetts Water Resources Authority*, —— U.S. ——, 113 S.Ct. 1190, 122

L.Ed.2d 565 (1993); G. Barnett, *Machinery and Labor* (1926).

Because of the unpredictable and short-term nature of much of the work in the construction industry, collective bargaining based on organizing after employees are hired is an incomplete means to protect the rights of employees. For this reason, exceptions to many otherwise applicable rules governing relationships among employers, trade unions and employees have been adopted by Congress. See 29 U.S.C. § 158(e), (f). These rules permit pre-hire agreements requiring employers to obtain their workforce from among union members. See *Building & Construction Trade Council v. Massachusetts Water Resources Authority,* —— U.S. ——, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993); *McNeff v. Todd,* 461 U.S. 260, 103 S.Ct. 1753, 75 L.Ed.2d 830 (1983); *NLRB v. Local Union No. 103,* 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). Such arrangements are vital to insuring to employees and their representatives the ability to bargain effectively in a volatile job environment, see Rottenberg, "Property in Work," 15 Ind'l & Labor Rel. Rev. 402 (1962). They have, indeed, replaced the raw conflict of earlier eras which often led to violence. See P. Zausner, *Unvarnished* (1941).

Pre-hire commitments to obtain workers from given sources, should they be deemed effectively non-cancellable and enforceable notwithstanding efforts by employers to extricate themselves from the arrangements at contractually defined times, would create self-perpetuating structures.[2] Such a situation would be adverse to the interests of both employers and employees, since a union would no longer need the support of employees within the collective bargaining unit to retain its position. The sole input from the workers whose interests are to be protected would then be through internal union political action on the part of members (not necessarily the entire workforce hired under union auspices), which Congress sought to protect in the Bill of Rights of Members of Labor Organizations, Title II of the Labor Management Reporting and Disclosure Act of 1959, Public Law 86–257, 73 Stat. 522, 29 U.S.C. §§ 411–415.[3]

These safeguards standing alone provide an incomplete counterpart to the realistic opportunity to select one's collective bargaining representative (or no representative) under 29 U.S.C. § 159. See Weyand, "Majority Rule in Collective Bargaining," 45 Colum.L.Rev. 556 (1945). The chief additional safeguard against ossification in the industry is the necessity for a union to retain the support of workers in the industry so as to be able to induce employers to accept its collective bargaining demands and not to opt out of the pre-hire contract during the customary 30–day "open season" period available prior to expiration. Employers are encouraged not to opt out when they discern the necessity to deal with a particular union (a) to obtain good workers or indeed any workers at all, (b) to secure customers who wish to deal with union shops, and (c) to avoid strikes, picketing and similar organizing tactics.[4]

Without an underpinning in employee-based economic power, a self-perpetuating contractual structure risks becoming di-

---

**2.** See *Hoover v. Ronwin,* 466 U.S. 558, 582–601, 104 S.Ct. 1989, 2002–12, 80 L.Ed.2d 590 (1984) (dissenting opinion discussing history of medieval guilds; holding of case not pertinent here). The labor exemption from the antitrust laws is premised on employee self-determination; were the exemption from antitrust strictures inapplicable, where "private actors are ... granted a 'degree of regulatory power' ... the scheme may be attacked ... as a 'hybrid' restraint." *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 354 n. 8, 107 S.Ct. 720, 726 n. 8, 93 L.Ed.2d 667 (1987) (Powell, J.).

**3.** Collective bargaining agents also have an implicit statutory duty to provide fair representation to all employees in the bargaining unit, whether or not members, under *Steele v. Louisville & Nashville R. Co.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); see *Chauffeurs, Teamsters & Helpers v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990).

**4.** Any no-strike clause, the counterweight to employer commitments in a collective bargaining agreement, of course expires with the agreement. See generally *Boys Markets v. Retail Clerks,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); Isaacson, "The Grand Equation: Labor Arbitration and the No–Strike Clause," 48 ABAJ 914 (1962).

vorced from its roots, with ill effects.[5] In order to maintain the stability important to job security and productivity, and at the same time to retain responsiveness to inevitable change in the performance of any entity including both unions and employers, collective bargaining contracts in the building and construction industry customarily—like the one involved here—prohibit employers from opting out except during a limited time window, but allow them to do so during that window.[6]

Employer notice of withdrawal may trigger various activities: efforts to renegotiate a new agreement, unfair labor practice charges under 29 U.S.C. § 158, a request for an election under 29 U.S.C. § 159 if sufficient stability of the workforce exists to make this meaningful; or economic measures brought to bear on the employer.[7] Interpretation of the collective bargaining agreements according to their explicit and implicit terms can protect both employer and employee interests, and can promote the benefits of stability and openness to changing needs.

### III

■ On March 11, 1993 the employer sent a letter to the District Council within the 30 day time window for avoiding automatic extension provided for in the agreement, advising that the Association, which had negotiated the most recent agreement between the employer and the District Council, would no longer bargain for the employer. Receipt of this letter by the District Council has not been contested, but it was not originally sent by registered or certified mail. A duplicate letter was thereafter sent by certified mail return receipt requested and received by plaintiff on March 26, 1993, also within the time window.

The District Council's response indicated that withdrawal from the Association did not constitute withdrawal from the collective bargaining agreement; on April 19, 1993 (after expiration of the time window), the employer explicitly repudiated any bargaining relationship with the District Council effective June 1, 1993.

The District Council argues that an agreement preceding the 1990 collective bargaining agreement negotiated by the Association remains in effect and has not been terminated. This, however, is unrealistic: continuation of two agreements, one of which (the current one) would evolve and change while an earlier one is still in effect would create significant risks of confusion in day-to-day contract administration if the provisions differed, as the District Council claims they do with regard to the time window to opt out. See *Puretest Ice Cream v. Kraft,* 806 F.2d 323, 325 (1st Cir.1986); compare also New York State Constitution art III § 16 (barring cross-references to other state laws which may have been amended in most situations). Indeed, the District Council's interpretation would seem to prevent an employer in U.W. Marx's position from ever opting out: a notice valid under either agreement would be untimely under the other. A collective bargaining equivalent of a Rule Against Perpetuities must be assumed to have been implicit in both contracts by virtue of each containing an opt-out period.

If an employer affirmatively and in compliance with the terms of a multi-employer agreement revokes authority for the association to proceed, this would appear sufficient action to be effective under *Cedar Valley Corp. v. NLRB,* 977 F.2d 1211, 1220 (8th Cir.1992) provided that the union receives the revocation notice. See *Trustees of UIU*

---

**5.** See Federal Bar Council, "Sweetheart Contracts," 23 Industrial & Labor Rel.Rev. 105 (1969); 115 Cong.Rec. § 6318 (daily ed. June 12, 1969), 115 Cong.Rec. pt. 12, 91st Cong., 1st Sess. 1560 (perm. ed. 1969).

**6.** The prohibition on renouncing a contract until expiration is imminent and then only within a specified period is akin to the "contract bar" rule applicable to decertification of a union through the election process. See *Bally v. NLRB,* 416 F.2d 902, 905 & n. 1 (6th Cir.1969), *cert. denied*

399 U.S. 910, 90 S.Ct. 2201, 26 L.Ed.2d 562 (1970); Freidin, "The Board, the 'Bar' and the Bargain," 59 Colum.L.Rev. 61 (1959); Naumoff, "An Analysis of the Contract Bar Doctrine," 7 Labor L.J. 197 (1956).

**7.** Each of these measures, such as the strike, picketing or persuasion exerted through pressure brought to bear upon customers, carries with it legal protections and restrictions, none of which needs be discussed here.

*Health & Welfare Fund v. New York Flame Proofing Co.,* 828 F.2d 79 (2d Cir.1987).[8]

The District Council further argues that abandonment of multi-employer bargaining is not the same as cancelling the other terms of the collective bargaining agreement. The notice of termination of multi-employer bargaining, however, was sufficient to put the District Council on notice of intent to end the contract. *International Brotherhood of Electrical Workers Local 532 v. Brink Construction,* 825 F.2d 207 (9th Cir.1987); see also *Local 92 v. B & B Steel Erectors,* 850 F.2d 1551 (11th Cir.1988); *William Chalson & Co. v. Amalgamated Jewelry, Diamond & Watchcase Workers Union,* 478 F.Supp. 1103 (S.D.N.Y.1979).

■ Continued compliance with provisions contained in an agreement after its expiration does not necessarily imply acquiescence in being bound, and is equally consistent with voluntary willingness to perform the particular acts involved. See *ILGWU National Retirement Fund v. Levy Bros.,* 1987 WL 16149, 1987 U.S.Dist. LEXIS 7731, Dkt. No. 84 Civ. 3673 (GLG), S.D.N.Y. Aug. 21, 1987.

Thus both contract language and national labor policy support a finding based on the undisputed facts that the employer validly disclaimed further adherence to any collective bargaining agreement effective June 1, 1993.

■ If, however, a party acts in a way causing confusion to another party, it cannot take advantage of the resulting situation. See *Schrader v. Royal Caribbean Cruise Lines,* 952 F.2d 1008, 1013 (8th Cir.1991); *Gallagher v. Donald,* 803 F.Supp. 899, 901 (S.D.N.Y.1992). Should an employer fail to notify a multi-employer bargaining association of its intent to withdraw from such an association, resulting in the Association sending to a union a list showing the employer on a roster of continuing members of the group, and this results in actual confusion, this may defeat the effectiveness of the employer's withdrawal. If this can be shown here, plain-

tiffs may move to reinstate their claims for post-May 1, 1993 contractual violations.

## IV

■ Where a collective bargaining agreement is violated, relief can still be had after its expiration. See, e.g., *Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal,* 786 F.2d 1459 (11th Cir.1986).

■ Relief is available to recover any welfare fund payments due under ERISA for work done utilizing non-District Council hirees prior to expiration of the collective bargaining agreement. Reliability of payments counted upon by welfare funds based on expected receipts for work within the ambit of the text of applicable agreements is vital to the solvency of the funds and to the protection of their beneficiaries. See authorities cited, *Schueler v. Roman Asphalt,* 827 F.Supp. 247 (S.D.N.Y.1993). Where, as here, the unpaid sums are due to a multi-employer fund, a remedy is particular important so that the stability of such funds protecting a large number of beneficiaries can be maintained. See generally *NLRB v. Local Union No. 103,* 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978).

In part for this reason, Trustee plaintiffs have been held entitled to such payments without regard to the existence or nonexistence of a jurisdictional dispute. *Tapers v. Bernie Wolff Construction,* 120 Lab.Cas. 11,089, 1991 WL 243428 (S.D.N.Y.1991) (JSM).

## V

While the issue of whether or not any actual violations of contract provisions occurred is not considered in ruling upon the current motions, it is important to the discussion of relief which follows to recognize the importance of whether or not the current controversy involves a jurisdictional dispute.

■ Every pre-hire contract requiring hiring of union members contains an explicit or implicit definition of the work, and the geographic area covered. See 1990 collective

---

8. The second notice was timely sent by the method of mailing specified in the contract. The purpose of such formalities as use of certified mail is, in any event, to assure actual notice—not

challenged here—rather than to create artificial traps for the unwary. See *Thomas v. Yonkers Police Dept.,* 147 F.R.D. 77 (S.D.N.Y.1993).

bargaining agreement, Art. IV, V, at 6, 17. Where work definitions or geographic delineations such as those in the 1990 collective bargaining agreement are contested by other unions, either by furnishing union workers to the employer or by other means, a jurisdictional dispute is created. The basic elements of a jurisdictional dispute are present if employees belonging to other unions performed the work the District Council asserts should have been given to its members, unless the use of those other employees was initiated by the employer unilaterally with the objective of reducing labor costs or for similar reasons.

The conduct of the parties is pertinent to evaluation of the status of a dispute as jurisdictional or solely contractual. Under the 1990 collective bargaining agreement, it is "specifically agreed that any controversy arising out of this Agreement involving the interpretation of its terms and conditions, shall be settled in accordance with the grievance procedure set forth in this Article." If voluntary resolution is unsuccessful, there is a provision for resolution through arbitration. Such clauses have been clearly enforceable under § 301 of the Taft–Hartley Act, 29 U.S.C. § 185 since *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Co.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("Steelworkers Trilogy").

The arbitration clause of the 1990 collective bargaining agreement would appear to be binding, and to bar invocation of judicial relief except to enforce or otherwise deal with an award pursuant to the grievance procedure, unless an exception to the broad scope of the clause is applicable. Exceptions are provided in the agreement for both hiring procedures and jurisdictional disputes, thus treating both as outside the normal ambit of the employer—union arbitration clause.

Disputes concerning interpretation of hiring provisions of the agreement would lend themselves to conflicts with other unions, and also to inter-union resolution with the assistance of the expertise of a labor arbitrator steeped in the traditions of the industry. Exclusion from the arbitration procedure of hiring and jurisdictional disputes reflects recognition that both have repercussions affecting third parties, and that they involve ramifications extending beyond the relationships between the employer and the District Council. While not conclusive, the structure of the arbitration clause thus lends weight to the possibility that the hiring aspect of the current lawsuit may be characterized as a jurisdictional dispute.

■ To avoid disruption of employee job stability or employers' ability to do business, jurisdictional disputes are customarily resolved by inter-union arbitration (see *Drywall Tapers v. Local 530*, 954 F.2d 69 (2d Cir.1992)) or by the National Labor Relations Board and not through litigation by a particular contestant against an employer caught in the middle of such a dispute. Where, of course, it can be shown that an employer created such a dispute arbitrarily in order to find personnel willing to accept lesser compensation, these considerations are inapplicable. See generally 29 U.S.C. § 160(k); *Newspaper Printing Corp. v. NLRB*, 692 F.2d 615 (6th Cir.1982); *Old Country Iron Works v. Iron Workers Local 40*, 842 F.Supp. 75, 78 (S.D.N.Y.1993); Goldstein, "Electronic Journalism and Union Rivalry," 29 Labor L.J. 137 (1978).

■ Where litigation with a single employer is initially involved, other jurisdictional disputants may be deemed necessary parties and which must be joined. See Fed.R.Civ.P. 19; *Alfarone v. Bernie Wolf Construction*, 788 F.2d 76 (2d Cir.), *cert. denied* 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986). Thus prior to determination of what relief, if any, can be provided for a seeming violation of a hiring hall requirement, any other unions contesting for the work by referring employees for it should be joined or notified and given an opportunity to intervene. See authorities cited, *Omar International v. ALAF*, 817 F.Supp. 394, 399 (S.D.N.Y.1993).

### V

■ While a union may sue for monies due its members, it must show that specific named persons are entitled to specific relief.

See *International Union v. Hoosier*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). It would be extremely difficult to reckon backwards after the fact and determine what union members who were not hired would have been available to have been hired by the employer.[9]

 A further obstacle may be presented if the District Council's objection to allegedly improper hiring decisions was deferred beyond the time of their discovery. Delay in claiming asserted damages during a period in which these damages accumulated might constitute laches barring recovery claimed at a later date. See generally *Bourne Co. v. Tower Records*, 976 F.2d 99 (2d Cir.1992); *Daingerfield Island Protective Soc'y v. Lujan*, 920 F.2d 32 (D.C.Cir.1990) (R. Ginsburg, J.), *cert. denied* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991); *In re New York Trap Rock Corp.*, 158 B.R. 574 (S.D.N.Y.1993).

The District Council has not, in its submissions so far, claimed ignorance at the time of the use by the employer of workers now asserted to have been improperly hired. Retroactive imposition of double wage costs on employers without specific warning at the time of the events involved would not further the purpose of the national labor laws.[10]

If a collective bargaining agreement was violated while in effect, nonmonetary prospective relief would be possible by means of injunctive order directed to the employer and all parents or affiliates under Fed.R.Civ.P. 65, should any of them be active in or re-enter the area.

SO ORDERED.

---

9. Mitigation of damages is required in labor relations as in other cases. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941). Consequently it would be necessary to determine, after taking other work opportunities into account, what actual losses were incurred by specific union members asserting deprivation of jobs available from the employer had the collective bargaining agreement been honored.

Payment in full for work not specifically designated as available to a particular person at the time, and not in fact performed, differs from awarding wages due for work done or back pay for wrongful dismissal. In this more speculative context, even if a remedy is appropriate, some value might have to be attributed to other activities actually or potentially pursued.

10. See *Battaglia v. GMC*, 169 F.2d 254 (2d Cir. 1948) (upholding Portal-to-Portal Pay Act, 29 U.S.C. § 251–262, limiting retroactive back pay awards for time spent reaching the pit of a mine.